NicholsoN, C. J.,
delivered the opinion of the court.
About 1840 the complainant, Stephen Haynes, being then possessed of but little property, was elected a constable for Knox county, and at the end of his term he was probably re-elected; and at the beginning of 1843 he had become the owner of a valuable estate, consisting of lands in Knox county and town lots in Knoxville. He was faithful and energetic as an officer, was a keen, shrewd trader, and was engaged during a portion of the time in carrying on in Knoxville a trade in liquors by retail. His drinking house was of a low order, was known as a place where the. “blind tiger” was kept, and in which a great deal of illegal traffic was carried on. Early in 1843 his connection with the “blind tiger” brought him into trouble, which resulted in various criminal prosecutions and convictions, on which judgments were rendered for fines and costs. One of these prosecutions was for wearing a bowie knife, which commenced in 1843, and resulted, in June, 1844, in a conviction-From the judgment in this case he appealed to the September Term, 1844, of the Supreme Court, at Knox *568 ville, at which term the judgment was affirmed; but the defendant- failing to appear, forfeiture was taken against him and his securities in his recognizance. He absconded, but in the summer of 1845 he was arrested by one of his sureties and committed to jail. Soon after he was committed to jail he manifested symptoms of insanity, and in a short time these symptoms assumed so aggravated a character, that proceedings were instituted in the County Court, which resulted, at its October Term, 1845, in a verdict of lunacy by a jury of inquisition, and in his removal to the lunatic asylum at Nashville as a lunatic. He remained there a short time, when he was discharged and returned to Knox county. He remained in Knox county during the year 1846, engaged in cultivating a farm, and about the beginning of 1847 removed with his family to Arkansas, where he still lives. After reaching Arkansas he again manifested symptoms of insanity, and these have been continued, with intermissions, until the filing of his bill in this case by his next friend.
After he had become involved in criminal prosecutions his attention to his business was diminished, and failing to satisfy the judgments which were rendered against him in 1844, in favor of the State and his individual creditors, his lands and town lots, not previously disposed of and conveyed by him, were levied upon and sold early in 1845. When he returned from the lunatic asylum most of his property was gone, and he was broken up.
The defendant, Wm. Swann, was an attorney-at-law at Knoxville, was possessed of a large estate, was re *569 lated by marriage to complainant, was intimate with him, gave to him his business that was to be transacted by a constable, recommended him ' as an officer to others, acted as attorney for him in several of his lawsuits, and had extended to him many favors and acts of friendship, and he enjoyed the confidence of defendant.
The bill was filed on the 12th of March, 1858. Complainant alleges that he was living in Knoxville in 1841 in prosperous circumstances, and the owner of a considerable property; that about this time his mind commenced failing, and continued to fail, until about the year 1843 it became permanently unsound. About this time — 1841, 1842, and 1843 — complainant became involved in some personal difficulties; was indicted iu the Circuit Court for Knox county for carrying a bowie knife; was thrown into jail by his bail; that he was finally convicted and sentenced to confinement in the jail; that in these difficulties defendant Swann, who had married a cousin of complainant, acted as his friend and counsel, and probably was one of his bail. Complainant alleges that he had a high regard for defendant, and had great confidence in his friendship and integrity.
Complainant next alleges that about 1843 or 1844 he left Knoxville, but returned about 1845, at which time he states that he was, or had been a short time before, the owner of twelve pieces or parcels of real estate, consisting of lands and town lots, which are described. He states that in 1843 or 1844, or 1846, he'placed in the hands of defendant all of his notes *570 and accounts and claims for collection. Among them was a note on John Russell for about $1,200. Defendant is called on to account for the claims.
Complainant further states that he is informed that about the year 1845 or 1846 defendant took possession, by his tenants, of all of said lots, houses and lands, and that he has held possession of them, except such as he may have pretended to sell off, up to the time of filing the bill, and has appropriated to his own use and benefit all the rents and profits arising therefrom. He states that he has never had a guardian, and that his family have failed in repeated efforts to bring suit, because they could not find a next friend who would give security for costs; that, in preparing to institute this suit, certain deeds have been found on the register’s books, which are supposed to be the foundation of the pretended right of defendant to the lots and lands in them specified. He exhibits three deeds — two dated 13th of May, 1843, and one dated February 6th, 1846. These deeds embrace the lots and lands before described as having been the property of complainant.
Complainant charges that in reference to these deeds there is not a sufficient consideration to support them, especially the deed of February 6, 1846, and that the considerations expressed have never been paid. He states, also, that at the times of their execution complainant was non compos mentis, and that fact was generally known, and to none better than to his counsel, the defendant Swann, for which reason he is advised they are null and void. He is advised that *571 defendant, occupying the fiduciary relation of counsel and attorney for him, at the times the deeds bear date, was not in a condition to purchase said property unless his conduct and dealings in that regard were characterized by the utmost openness, fairness and good faith, and the contracts supported by an adequate consideration. After specifying certain lots which he alleges to • have been sold to designated purchasers, but without making them parties, he prays that the deeds be set aside, except when the lands have been sold to innocent purchasers, that the titles be re-invested in him, and that he have an account for rents of lands and an account for claims collected.
Defendant Swann filed his answer on the 20th of January, 1859. He says that complainant once lived in Knox county, and by some means (justly or unjustly) became the owner of a considerable property, and that for a number of years he acted as constable and, as such, did a large business; that respondant had various dealings -with him, and entrusted to him mostly his constable business, but says he was not at any time the chief or principal counsel of complainant, but on many occasions he, as well as other attorneys, gave him advice as to his duties as constable. He denies that complainant was incapable of making valid contracts at any of the times he took conveyances from him, but says he was more capable of overreaching than being overreached. He states that he paid the considerations expressed in each of the deeds, and explains why, in one of the deeds of May 13, 1843, the consideration paid is expressed to be equivalent to *572 $1,010, the consideration paid for the property by complainant. He says the consideration of $150 for the property relinquished in the deed of February 6, 1846, is not inadequate, as he only bought complainant’s equity of redemption in the property. He sets out his titles to all the property embraced in the three deeds, except the Walker tract of land of 100 acres, to which he sets up no claim in his answer, although it is embraced in the deed of February 6, 1846, and he gives no explanation as to why or how the same was so embraced. He denies that he ever received any notes or claims from complainant for collection, and insists that as to the Kussell note, it was for $600, and was sold and assigned to him by complainant and not placed in his hands for collection. He gives a history of complainant’s criminal cases, specifies the cases in which he was counsel, and denies that he was attorney in any others; says he was attorney in the bowie-knife case, and probably was one of complainants • bail, but shows that it was on his recognizance to the court when his bond was forfeited. He insists that after complainant came out of jail he was of sound mind, except when it suited his purpose to ■ be otherwise; and finally, he relies upon the statute of limitations. Soon after filing his answer, defendant Swann died, and the cause has been revived in the names of his widow and heirs.
After proof was taken upon the issues thus made up, the Chancellor, at the July Term, 1861, decreed in favor of complainant as to all the property, except the claim for moneys collected as attorney.
*573 In further considering the case, it will be most convenient to examine the several questions in ' the order in which they are stated and determined in the Chancellor’s decree.
In regard to the lot on Gay street, adjoining the lot of Cowan, which formerly belonged to the estate of James Bell, the Chancellor was satisfied by the proof that it was purchased at a sale of the real estate of James Bell, deceased, by complainant Stephen Haynes, and that the purchase money was paid by him, but that the legal title was vested in Wm. Swann. He therefore decreed that the title be divested out of Swann’s heirs, and vested in complainant. Does the evidence support this decree? It is not controverted that the original owner' of this lot was James Bell, and that it was sold by decree of the Chancery Court for the payment of his debts. The Chancellor’s decree rests upon the conclusion that complainant not only purchased the lot at the chancery sale, but that he paid the purchase money. The only evidence to sustain this conclusion is found in several depositions, which we will proceed to notice.
A. G. Jackson, in answer to the question, “what property was owned by Stephen Haynes shortly before the change (in his conduct) to which you have referred?” replied: “A store-house on Gay street, now occupied as a clothing store by H. Kahn, adjoining Cowan, Dickenson & Co.”
James H. Cowan, in answer to a similar question in regard to the same lot, testified: “Stephen Haynes was the owner of that property, and he rented it. *574 I can not say certainly that I was present when this property was purchased at Bell’s sale by Haynes. I think it probable that I was, as I wanted to buy it myself.” He said further, “ I think I know that Haynes purchased the property at that sale.”
S. S. Thompson, in answer to the question: “what real estate in Knox county was in the possession of Stephen Haynes and claimed by him whilst he resided at Knoxville?” testified: “A store-house on Gay street, adjoining Cowan & Dickenson, where Kahn is now,” &c. George M. White, in answer to the question, “ what real estate was claimed and possessed by Stephen Haynes while he lived in Knoxville?” testified: “A business house on Gay street, adjoining Cowan, Dickenson & Go., and now occupied by Kahn as a clothing store,” &c.
Seth Lee, in answer to a cross-question by defendant, as follows: “State over the trades and circumstances you say he told you about,” testified: “He told me of buying the house near Cowan, Dicken-son’s,” &c.
James Smith, in answer to the question, “what real property had Haynes been in possession of, claiming it as his own, before he ran away ” ? testified: “A brick store near Cowan’s, on Gay street,” &c. “ These Swann told mo of shortly after his purchase of these,” &c.
This is the entire evidence in support of the proposition, that Haynes purchased the lot next to Cowan & Dickinson at the chancery sale, and paid the purchase money. . Cowan thinks he was at the sale, *575 and thinks he knows that Haynes was the purchaser. He states that Haynes rented the property, and all the other witnesses prove that Haynes possessed and claimed it, but no witness, except Cow-au, refers to his having purchased it at the chancery sale, and neither of the witnesses testify as to Haynes having paid the purchase money. It appears from the record in the case that the sale of the lot took place on the 3d of January, 1842. The several deposition^ were taken about seventeen years after the sale.
The evidence in support of the claim of Swann to the lot, is found in the record of the case of the petition of N. and M. Hewitt, administrators of David Bell, deceased, which was finally heard at the April Term, 1842. To that term the administrator reported that, “having been appointed at the last term of this court to make sales of certain negroes and certain real property named in the petition, in obedience to said decree I did, on the 3d of January, 1842, at the court-house in Knoxville, sell the storehouse and lot mentioned in 'the petition, to "William Swann, for the sum of $1,925. William Swann, the purchaser, has paid up the purchase money.” It further appears from the record that this report, being unexcepted to, Chancellor Williams decreed that it be in all things confirmed, and that the Clerk and Master make title to the lot sold to William Swann, or his assignees, the purchase money having been paid, divesting all the title out of the heirs of David Bell, deceased, and vesting the same in said purchaser, or his assignees. It further appears *576 from the record, that upon the reference to the Clerk and Master to make proof and report the indebtedness of the estate of David Bell, and the consequent necessity for a sale, William Swann was examined as a witness, who testified that the estate was indebted to him in about $2,300 or $2,400, for which judgment is rendered. We have here record proof that Swann was the purchaser at the sale, at the price of $1,925/ and that although the sale was on a credit of twelve months, he paid the purchase money down, which circumstance is explained, probably, by the fact that- he was a creditor of the estate by judgment to the amount of $2,300 or $2,400. So far as the record speaks, Haynes had no connection with or interest in the sale or purchase of the property.
It would overturn fundamental principles of law, to hold that a title thus resting on a solemn adjudication of a court, can be set aside by the recollections of witnesses, however honest and intelligent, who detail their impressions and belief as to transactions that occurred seventeen years before they were examined, and which impressions rest mainly on the declarations and conduct of one of the parties, so far as we can see, in the absence of the other party. But some stress has been laid on the fact, that in the decree of the Chancellor the Clerk and Master is ordered to make the title to William Swann, “the-purchaser or his assignees.” It is argued that we are to infer from this direction to the Master that Haynes was the actual purchaser, and that by some arrangement between them the title was vested in *577 Swann for Haynes’ benefit. We are unable to raise a trust on a mere conjecture like that. We suppose the real explanation of the language of the decree to be, that although Swann was the purchaser and had bid $1,925, in so much satisfaction of his judgment against Bell’s estate, he was willing for Haynes to have the property, upon paying him his money, and hence the provision in the decree that the Master might make the deed to Swann’s assignee. It is probable that as the lot was sold on twelve months time, Swann was willing to let Haynes take the property, by paying the purchase price according to the bid, and hence, that Haynes may have claimed and rented the property for the year after the sale. No valid trust would be raised by such a parol agreement, if one were proven, especially as there is no evidence as to any payment of the money by Haynes, either to the administrator of Bell or to Swann. We are therefore constrained to differ with the Chancellor as to his conclusion in regard to the house and lot on Gay street, adjoining Cowan and Dickenson. We see no ground for divesting the title out of Swann’s heirs and vesting it in Haynes. By the record, the equitable title was vested in Swann, and there is not that clear and satisfactory proof to support the claim of Haynes, upon which a resulting trust can be set up.
The decree of the Chancellor next recites, that it appears that the two deeds executed by Haynes to Swann on the 13th of May, 1843, for three town lots, were executed as mortgages to save Swann harmless as appearance bail for Haynes, and that Swann never sufi- *578 ferecl damage thereby. Therefore he decreed that the title be divested out of Swann’s heirs and vested in Haynes.
We waive for the present the question raised by defendant’s counsel, that the pleadings in the case do not present the question whether the deeds are mortgages or not, and proceed to examine whether . the evidence sustains the conclusion of the Chancellor, that the deeds were executed as mortgages and not as absolute deeds.
It is not denied that one of the deeds is clearly absolute on its face, but it is suggested that there are expressions in the other, which, taken in connection with the fact that the deed was not registered for more than a year after its execution, are calculated to excite suspicion as to that deed being intended as an absolute conveyance. It is true that both deeds were executed on the same day; that one was registered soon after its 'execution, and that the other was not registered for more than a year afterward. It is also true, that one deed purports to be made for the consideration of $1,000 in hand paid, and the conveyance is absolute and without condition or reservation, while the other uses the language: “this relinquishment,” etc., and “the said Stephen Haynes, for and in consideration of a payment made to him by the said Swann, equivalent to the purchase money aforesaid paid for said lot, or part of a lot, the receipt whereof is hereby acknowledged.” After conveying the lot to Swann and his heirs, the deed proceeds to convey “all the right, title, interest, claim and demand, which he, the *579 said Haynes, in law or equity, has in and to tbe said lot or piece of land, with the • appurtenances, with the right to sell, dispose of, or enjoy the same, and the proceeds thereof, and all other emoluments or advantages therefrom, which the said Haynes could or should, either in law or equity, enjoy. And, if necessary, the said Swann is hereby, in and for the consideration aforesaid, authorized and empowered to use the name of said Haynes, and his heirs, in any way for the furtherance, recovery and establishment of the right hereby vested in the said Swann and his heirs forever.”
We are wholly unable to see in this language anything indicating that the conveyance was not intended to be absolute; on the contrary, the idea that it was not intended to be absolute seems to be specially ignored. But defendant Swann assigns a reason, in his answer, for the difference in the language used in the two deeds. He says: “The first transaction respondent had with Haynes, of any importance, was the purchase of a part of a lot, No. 22, in Knoxville. Haynes had purchased this property in October, 1841, at a chancery sale, a decree for which was registered 29th of January, 1842. The consideration paid was ten hundred and ten dollars. Afterwards, on the 13th of May, 1843, Haynes sold the property to respondent for a sum equal to the amount of the purchase money paid by him. Haynes had been in the receipt of some rents, and had removed from the premises some of the buildings. Some of the rents, perhaps, were unpaid. These were intended to go with the purchase by respondent, which accounts for *580 a clause in said conveyance. The sale was made so as not to include the widow’s dower interest.” This explanation is consistent with the face of the deed, and has every appearance of truth and fairness. We conclude that on their faces the deeds are both absolute; and if they were intended to be mortgages, that intention must appear from the parol proof.
The Chancellor’s decree rests upon the conclusion that Swann was bound as appearance bail for Haynes, and that the deeds were intended as indemnity for such liability. The testimony of David W. Nelson is mainly relied on to support the hypothesis that the deeds were intended as mortgages. In answer to this question: “ State fully the facts in relation to your father, John K. Nelson, and Wro. Swann becoming bail for Stephen Haynes, and what indemnity was taken by either of them,” he testified: “ My father, J. R. Nelson, became joint security, together with Wm. Swann, for Stephen Haynes, on a charge of the State against the said Haynes for malicious stabbing, about the year 1843. Haynes absconded before the case against him was tried. My father, the second day after I had understood Haynes had gone, asked me to go with him and see Maj. Swann. We walked along together but a few steps when we met Maj. Swann riding towards Knoxville. My father asked him: “What shall we do, Billy, about our man Haynes? I’m told he is gone.” To which Maj. Swann replied: “Well, Colonel, let him go, and don’t make yourself uneasy about it. I have plenty of his property in my hands to save us.” I did not know *581 ■at the time what the amount of their liabilities were in that case; but my father, who is since dead, and with whom I was then practicing law as a partner, told me it was one thousand dollars. He also told me that Maj. Swann and him stepped aside from where I then stood that Haynes had secured him (Maj. Swann) by making conveyance of town property — the old Anthony tavern, the Drury Armstrong house and lot, one- oh the opposite side on the south side of Front street, and two houses and lots near the foot of Main street, near the bridge. Maj. Swann, in repeated conversations with my father and myself, stated the same thing that Maj. Swann .told father privately at the beginning, and said to him in my presence: “Let him (Haynes) go. I told you at the start that we are safe; I’ve got enough from him to save us.”
In answer to a question by defendant, Nelson said: “ I know nothing individually or personally about the precise time of the absconding or the arrest. I merely know that Haynes was here, and then, after he was said to have gone, father, as one of his sureties, went away and brought him back. I think this was in 1843, but of the precise time I can not be certain.”
Complainant relies on the evidence of James Smith, as corroborating that of Nelson. The portion of it which bears upon the point under examination is as follows:
Witness was in Swann’s blacksmith shop one morning, when Haynes gave to Swann a note on John *582 Russell for collection — it was for a negro or negroes that Haynes had sold to Russell. He thinks this occurred before 1845, but can not recollect the precise date.- Haynes did not say he was going away, but shortly after that he ran away. Witness heard Wm. Swann and J. R. Nelson say they were Haynes’ bail when he got into difficulties about the bowie-knife. In answer to the question, “If you heard any conversation between Swann and Nelson with regard to danger of loss on account of their being bail for Haynes, state what was said,” he testifies: “ Nelson came to Swann’s shop, and seemed to be out of humor about being Haynes’ security. Swann told him he need not be out of humor, as he did not think he (Nelson) would lose anything by it. They went off and had a secret conversation. I did not hear what that was.”
Witness further said, it was between 1842 and 1845 that Haynes gave Swann the note for collection, and that was about a year before Nelson had Haynes put in jail.
John Russell was examined, and produced the note described by the witness Smith, as having been given by Haynes to Swann for collection. It appears that the note was for $600, dated February 22, 1842, and payable twelve months after date, and endorsed on the 23d of February, 1842, to Swann. This fixes the date of that transaction, and also the date of Haynes’ running away, as proven by Smith. At one time he says Haynes ran away shortly after the note transaction, and afterwards he says Nels.m had Haynes *583 put in jail about a year after Haynes gave the note to Swann for collection. According to Smith’s evidence, therefore, ■ Haynes ran away shortly after February, 23, 1842, and was arrested and put in jail by Nelson about a year afterwards, which would be in 1843. In this Smith corroborates D. W. Nelson, who says he thinks his father brought Haynes back in 1843. The record contains a transcript of a case of the State against Stephen Haynes for wearing a bowie-knife, from which it appears that the indictment was found at the February Term, 1843, of the Circuit Court of Knox county. This transcript shows that Haynes was tried and convicted at the June Term, 1844, of the Circuit Court, and that upon his appeal to the September Term, 1844, of the Supreme Court, John R. Nelson and ¥m. Swann were recognized as Haynes’ bail in the sum of $500, for his appearance at the supreme Court.
The proof is abundant and uncontradicted, except by the evidence of Nelson and Smith, that Haynes forfeited his recognizance to the Supreme Court at its September Term, 1844, and that it was in September or October, 1844, that he ran away, and that it was not until some time in the summer of 1845 that J. R. Nelson arrested him, as one of his bail, and put him in jail.
It is therefore clear that the time fixed by witnesses, Nelson and Smith, for the conversations in which Swann told J. R. Nelson that they were indemnified, is altogether erroneous. As these conversations "had direct reference to the fact that Haynes had run *584 away, they could not have occurred before September or October, 1844, and must have had reference to the liability "of J. R. Nelson and ¥m, Swann as Haynes’ recognizance, entered into in June, 1844, which was more than a year after the two deeds of May 13th, 1843, were executed. This is conclusive against the evidence of these two witnesses, unless we assume that the witnesses are mistaken as to the fact of Haynes having run away being the subject of the conversation, and that they had reference to a prior liability entered into by them as bail. This difficulty is sought to be removed in the argument by the assumption that after the indictment was found in February, 1843, and before the execution of the deeds on the 13th of May, 1843, Haynes had been arrested by the sheriff, and J. R. Nelson and William Swann had become bound in a bond to the sheriff for his appearance to the Circuit Court. We find nothing in the record to sustain such an assumption. If such bail bond had been taken, it devolved upon complainant, if he rested his case on such a liability, to produce it in evidence or to account for its absence. Neither is done, but we are urged to presume that the sheriff did arrest Haynes, and that J. R. Nelson and Wm. Swann were his bailsmen. We know of no principle of law that would authorize us to resort to such presumption. Without referring to the various circumstances relied on in. argument to show that the evidence of the two witnesses, Nelson and Smith, is unreliable and insufficient to sustain the conclusion that the two deeds of May 13th, 1843, were intended to be mortgages, we *585 are satisfied, on the view already taken, to hold that the Chancellor’s conclusion is not supported by the clear and cogent evidence which is required to convert an absolute deed into a mortgage: Nickson v. Toney, 3 Head, 655.
If it were necessary to determine the question whether complainant could have relief under the rules of equity pleading, even if the fact had been satisfactorily established that the two deeds were intended as mortgages, we should find it very difficult to find ground upon which to stand in granting the relief. The bill nowhere charges or intimates that the deeds were executed as indemnity for the liability of Nelson and Swann as bail, and only incidentally alludes to the fact that Swann was one of his bail, and then he speaks doubtingly, and only says that he was probably one of his bail. It would require an unusual stretch in the application of the rules of equity pleading to hold that under the form of the bill the relief could be granted. But as the proof fails to make out a case for the relief, it is not necessary to decide the question as to the jfieading.
The Chancellor next proceeds to decree that the deed of February 18th, 1846, by Haynes to Swann, whereby .his equity of redemption in and to six houses and lots in Knoxville, and a tract of land of 100 acres, was released and assigned to Swann for the consideration of $150, was null and void; first, because Haynes was of unsound mind at the date of the conveyance; and, second, because the consideration was grossly inadequate, especially as it was a transaction *586 between attorney and client; therefore, he divests the title to all the property described in said conveyance out of Swann’s heirs, and vests it in Haynes.
The bill alleges that complainant showed symptoms of insanity in 1841, which resulted in confirmed insanity in 1843, and that he has so continued to the filing of the bill. The proof wholly fails to establish these allegations of insanity at a period prior to the summer of 1845, when complainant was arrested by one of his bail and placed in prison. It is shown that from 1840 to 1844 he was probably twice elected constable, and served as such with efficiency and success; that during part, and probably most, of this time, he carried on a drinking house known as “The Blind Tiger;” that he was a shrewd and successful trader, having accumulated during this period most, if not all, of the large estate in controversy, and that he was tried and convicted of a high misdemeanor, besides numerous smaller of-fences, and no plea of insanity interposed in any of the cases. These things are entirely inconsistent with any pretense of insanity during this period. Any occasional eccentricities that are proven during this period excited no suspicion of his insanity among his acquaintances, and may be reasonably regarded as indications that he was going into his habits of intemperance. These eccentric freaks were so far from making the impression that he was insane, that even when he was in jail, giving strong symptoms of mental aberration, we find a suspicion existing that these manifestations were feigned. But the question of Haynes’ sanity at the date of the two deeds is established by *587 tbe evidence of the two subscribing witnesses, George and-, both of whom testify that he was at that time of sound mind. But in the summer of 1845, during his confinement in jail, the evidence shows that he manifested such symptoms of insanity that proceedings were instituted in the County Court at its October Term, 1845, which resulted in a verdict of insanity and in his being sent to the lunatic asylum.
The fact of insanity having been judicially ascertained on the 5 th of October, 1845, the law presumes its continuance until his restoration to sanity, or until a lucid interval is established by evidence. It does not appear in the evidence how long complainant remained in the lunatic asylum, or for what reason he left the institution. It is shown satisfactorily that he was absent at the asylum only a short time, and we think the evidence shows with reasonable certainty that he returned to Knoxville late in 1845 or early in 1846. But the record contains nothing from which we can presume with certainty that he was discharged by the officers of the asylum because they adjudged him restored to sanity, but we may regard it as probable that such was the fact. If there was such evidence, we should hold it at least primet facie evidence of restored sanity. But without such evidence, we must determine the question by reference to other proof.
The first witness relied on by complainant to show his insanity after his return from the asylum is Sa.m’1 McCammon. He was sheriff, lived in the jail while complainant was confined there, was a witness before *588 the jury of inquisition to prove insanity. He says that the first time he noticed anything like insanity in complainant was some time after he was committed to jail by J. K. Nelson. In answer to the question by complainant, “After he was with you in jail, did you ever look upon him as a man in his right mind?” he says: “After I placed him in the asylum I never remember seeing him but one time, and then not long enough to know much about his mind ; or if twice, I don’t remember it. He then spoke to me friendly and politely, and I did not see him do anything that I would consider insane. His expression of countenance I did not think differed any great amount, if any, from his formerly, which I never had regarded as expressive of insanity. I have seen something brisk and eccentric, I thought, though not more so than some others I have seen who were not insane.”
The next witness relied on is John Gibbs. He went with the sheriff, when he carried complainant to the asylum; gives his conversation and conduct on the way, indicating insanity, but he says nothing about his condition after he returned from the asylum. He says complainant staid only a short time in the asylum. The next witness is J. R. Draper. He went with complainant to the asylum. He details the conversation and conduct of .complainant on the way, showing that he was then insane. He had frequent business transactions with complainant before his derangement, and considered him to be a shrewd trader. In answer to the question by defendant’s counsel, if he saw Haynes after his return from the asylum, and *589 wbat was then his state of mind, he said: “ I saw him after his return from the asylum, in the streets of Knoxville, and I conversed with him about things that' took place when we were going to Nashville, and he appeared to be perfectly rational, and he remembered me and things that had taken place on the road.” He further said, he did not hear of Haynes’ insanity until after he was put in jail.
The next witness is James Kenedy. He went with complainant to the asylum, and details his conversation and conduct on the way, showing his insanity. On cross examination, he says he saw Haynes but once after his return from the asylum, and then only for a moment; he saw nothing wrong in him. Complainant’s counsel also referred to the evidence of Samuel H. McClannahan, one of defendants witnesses, as showing complainants insanity after his return to the asylum. This witness said: “I was acquainted with Haynes from 1819 .until the time he left Knox county. I have had some little dealings with him, not very much. Have been with him frequently hunting and fishing. At that time I thought him very smart. After he got to keeping a grocery I did not associate with him very much. He seemed to be making property very fast, and not associating with him I could not judge of the character of his mind. After I heard he was deranged I had some conversation with him, purposely to see how that was. He did not talk like a man in his right mind, but I had my doubts about him. This was when he lived in the lower end of the county, and I think it was *590 after the indictments were gotten up against him.” This witness fails to designate the time of his conversation with Haynes, except that it was when he was living in the lower end of the county. The only allusion we see in the record to his being in the lower end of the county, was when he was arrested by Nelson and Mabry, and that was in the summer of 1845. Witness also says his conversation was after the indictments were gotten up.
This is all the evidence relied on by complainant to show his insanity after his return from the asylum.
Defendant relies upon the following evidence to support the sanity of complainant during- the year 1846. It is in proof that Haynes returned from the asylum late in 1845 or early in 1846, and that he made a crop in 1846, on the tract of land known as the Scott place.
James Smith, one of complainant’s witnesses, testified that he saw Haynes after he came back from the asylum, and traded with him, and that he did not see any thing the matter with him. Witness believed him restored; saw him plowing and making crops, and had intercourse with him every week or two. Haynes said he could not make a living there and was going to Arkansas.
Alex. Scott, a witness for complainant, in answer to the question by defendant: “ were you acquainted with Haynes after his r’eturn from the asylum?” testifies: "I saw him every day almost, after he moved down there, and made his crop. He lived there ten or twelve months. We lived in sight of each other. *591 Tbis was after lie came from the asylum. I think that during that time Haynes was a rational and sane man; in fact I believe he never was crazy. After he moved there we had some chat together nearly every day.”
W. N. Maxwell testified, that Haynes lived in his neighborhood after he left Knoxville, and witness was at his house several times. Went with Haynes on the boat as fardas Kingston, when he started to Arkansas, and he then regarded him as a sane man, and thought him a sharp trader from the way he was selling his property before moving. He lived near witness about a year before moving to Arkansas. He told witness Major Swann was his relation and friend, and had rendered him many favors.
Seth Lea testified that he first knew Haynes in Blount county, and after he came to Knoxville, say about forty year’s time, till he left the county. After he left Knoxville he moved to witness’s neighborhood, and lived on a farm he claimed as his own. He lived there for a year, or may be more, until he moved to Arkansas. The farm was in the possession of Swann. After Haynes left, the farm was sold at the suit of Cowan and Dickenson, and redeemed by Swann, and Swann let Haynes stay on it. Witness knew Haynes as well as anybody, and from all he knew of him, he considered him as a sane man. He was a shrewd trader, and made property very fast. Haynes told witness before leaving for Arkansas, that he was badly “jammed up” in Knoxville. He understood him to mean that his property was gone.
*592 John Coker testified that he knew Haynes eight or ten years while he lived in Knoxville, and after-wards about a year when he lived in witness’s neighborhood. Had frequent opportunities by conversation, business transactions, etc., of judging of his mental condition, and from these considered him a sane man. Never noticed any marks of insanity about him during the year he lived in witness’s neighborhood. Saw Haynes every week or two.
Adam Eormault testified that he had known Haynes from his boyhood, and until he left for Arkansas. Had some trading with him and various conversations. Never regarded him as an insane man. Always looked upon him as a shrewd trader, in shaving notes, buying negroes and other property.
We can draw but one conclusion from all this testimony, that after Haynes returned from the asylum and until he removed to Arkansas he was of sound mind. No one witness, either for complainant or defendant, furnishes any ground on which his sanity during this period can be questioned. No one act and no one word of his indicating insanity during the year 184.6 is proven. The only witness who expresses a doubt is McClannahan, and it is not all clear that his conversation took place during the year 1846.
But there is one witness whose testimony relates to the date of the conveyance made on the 6th of February, 1846. That witness is Thos. Lodgers, who was a subscribing witness to the deed. After proving that he was a witness to the conveyance, in answer to the question, “what was the condition of *593 Stephen Haynes’ mind at the time of the execution or acknowledgment of said deed ? ” he testified: “ Í thought him a man of sound mind and capable of making his own contracts. I have known him ever since he was a boy, and up to the time he left for Arkansas.”
We are therefore satisfied by the evidence, that when Haynes executed the conveyance on the 6th of February, 1846, he was of sound mind, and that the same is valid and binding unless it was affected with fraud.
It is alleged in the bill that the considerations stated in the deeds are insufficient to support them, and especially as to the deed’ made on the 6th of February, 1846, the consideration is so grossly inadequate as to shock the conscience of a court of equity; besides, it is alleged that these considerations were never paid. Defendant is called upon to answer each and every allegation on oath.
The answer of defendant as to the deed of May 13th, 1843, in which the consideration expressed s $1,010, is, that this was the amount paid for : he property by complainant, and that Haynes sold Ihe property to defendant for a sum equivalent to the .mount of the purchase money paid by him, and that he paid Haynes the full amount of the purchase money agreed on. As to the deed of May 13th, 1843, in which the consideration is expressed to be 31,000, he answers that this was the amount paid for it by Haynes, and that defendant paid Haynes $1,000 for the lot.
*594 As to the two deeds of May 13th, 1843, defendant’s answer is responsive to the allegations, both as to the adequacy of the consideration and as to its payment. There is not sufficient evidence contradicting the answer to overturn it.
In answer to the allegations of inadequacy of consideration in the deed of February 6th, 1846, and its non-payment, defendant says: “The property mentioned in this deed had been sold by virtue of executions and orders of sale, and was sold by the sheriff, under process, etc., on the 10th of January, 1845. Near thirteen months after this sale of property, at the special request of Haynes, respondent purchased his right of redemption (he, Haynes, alleging that he was unable to redeem, and if he done so others of his bona fide creditors would again subject the property to sale for his debts). The consideration of this deed may appear small, but not so as to shock the conscience of the Chancellor, when it is apparent that others had similar rights, with himself, to redeem at the execution of this deed of relinquishment. Said Haynes acted with shrewdness and intelligence, and obtained from respondent the consideration mentioned in that conveyance, which respondent never used, using his own bona fide claims in the redemption of property, whenever advanced on or redeemed, as the conveyances referred to will show.”
According to this response to the bill the deed of February 6, 1846, was only a relinquishment by Haynes of his equity of redemption in certain lots therein specified, which had been sold more than a *595 year before, and for which the sherifF had made deeds to the purchasers, defendant himself holding some of the deeds, and other purchasers others. All other things aside, we could' not say that the consideration of $150 for the right of redemption was of itself so grossly inadequate as to raise' the presumption of fraud. It is mere matter of speculation as to what was the value of the right of redemption. The property itself may have been of so much value that the consideration of $150 would be too inadequate to suppose that a man of ordinary sense would have accepted it; and yet, situated as this property was, and broken up as complainant said he was, he might consider $150 as a satisfactory consideration for a right of redemption which must expire in less than a year, and which right he had despaired of making available by raising the amounts bid on the lands.
Thus viewed, we can not hold that the inadequacy of consideration was so gross and manifest that, as Lord Thurlow has observed, it is impossible to state it to a man of common sense without producing an exclamation at the inequality of it, and hence that, from that fact alone, there must have been imposition or oppression in the transaction: 1 Bro. C. C., 8. But the answer of defendant is deceptive in representing all the lots and land described in the deed of February 6, 1846, as having been sold under executions, and that all that was conveyed to him for $150 was the equity of redemption. Besides the lots actually sold by the sherifF, the conveyance embraces a tract of land of one hundred acres, estimated in the *596 proof to be worth $1,000, and a lot in Knoxville estimated at $500, neither of which had been sold, but both of which were conveyed by the deed, and the consideration of $150 covered them, as well as the right of' redemption of the other lots. Defendant fails to explain in his answer why these two pieces of property were embraced. We find nothing in the record showing whether Haynes owned the one hundred acres of land and the town lot or not. If he did — and we are so to presume from the deed written and accepted by defendant — then Haynes was able to redeem the other lots; and so much of the answer as states that Haynes relinquished his right of redemption because he was unable to redeem, is not true.
Again, it is stated in the answer that Haynes accepted $150 for his equity of redemption because he knew that if he redeemed, his other creditors would again levy on and sell the lots. But we find in the record no evidence that Haynes had any other creditors who could have thus levied on the lots.
If to these circumstances we add the fact that the relations between complainant and defendant had long been intimate; that complainant had such confidence in defendant that they had several times held the relation of attorney and client — though we are unable to see that this relation existed in regard to the property embraced in the three conveyances — and that defendant had been the friend of complainant, and had done him many favors; that complainant was at the time in a straitened condition; viewing these circumstances in connection with the facts before referred to, *597 we feel constrained to regard tbe conveyance of February 6, 1846, as constructively fraudulent. In such case the vendee becomes, by implication, a trustee for the vendor. But a party applying for the assistance of equity on the ground of fraud, must have been prompt on the discovery of fraud; long delay, if unexplained, will be sufficient to occasion a denial of that assistance: 2 Stor. Eq., s. 1520.
In this case there has been a delay of twelve years before application was made for relief. The explanation of this delay is found in the allegation that complainant was of unsound mind when all three of the deeds were executed, and has so continued to the present time. We have seen that this allegation is not sustained, except for a few months in the year 1845, and after the removal of complainant to Arkansas in 1847. The evidence shoAvs that complainant has man-fested unsoundness of mind during much of the time since his removal to that State. It shows, however, that in 1855 or 1856 he returned to Knoxville for a short time, and that he was then of sound mind. It is not alleged that defendant in any way concealed the fraud from complainant. On the contrary all the deeds were spread upon the books of the register. Complainant is shown to have resided in the county of Knox nearly a year after the last deed was made, and that during that time he was in the full possession of his mental faculties. It is alleged in the bill that defendant took possession of the property as early as 1843 or 1844, and has ever since held it as his own, receiving the rents and appropriating *598 them as his own, thus showing that complainant knew for fourteen or fifteen years, that defendant was setting up an adverse possession. Under all these facts, both by reason of the delay and by force of the statute of limitations, we think the complainant is repelled and that he has lost all right to relief as to any of the property embraced in the three deeds. As to the Russell note, we think the proof is satisfactory that it was not received by defendant for collection, but that it was purchased by and regularly endorsed to him.
As to the 100 acre tract of land, known in the record as the Walker tract, and the town lot included in the deed of February 18, 1846, but which had not been sold by the sheriff, known as the Seabut lot, we find nothing in the record showing that Haynes had any title, and we understand Swann in his answer as setting up no claim thereto. If these two pieces belonged to Haynes, his title is not affected by this opinion.
As to the Bearden tract of fifty-five acres, wo are satisfied by the evidence that Swann conveyed that to Mrs. Haynes, and that the title is still in her, unaffected, as far' as we see, by the statute of limitations.
The Chancellor’s decree will be reversed and the bill dismissed. The costs will be paid by defendants.